Filed 8/21/24  P. v. Sanchez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HERMOGENES SANCHEZ,<br><br>Defendant and Appellant. | B329836<br><br>Los Angeles County<br>Super. Ct. No. LA094183 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Charles Chung, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Hermogenes Sanchez of four counts of forcible rape and one count of forcible oral copulation of a minor. Sanchez's victim is his biological daughter. On appeal, Sanchez argues the trial court admitted improper expert testimony and erred by failing to instruct the jury on a lesser included offense. We disagree and affirm.

## FACTS AND PROCEDURAL BACKGROUND

The People filed an information charging Sanchez with four counts of forcible rape of a minor 14 years of age or older (Pen. Code, §§ 261, subd. (a)(2), 264, subd. (c)(2))[1] and four counts of forcible oral copulation of a minor 14 years of age or older (§ 287, subd. (c)(2)(C)). As to each count, the information alleged an aggravating circumstance that the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)).

1.     ***The People's case***

Sanchez's biological daughter, H.S., testified that she was born in Guatemala in 2004. Growing up, Sanchez would hit H.S. if she misbehaved.

Sanchez started sexually abusing H.S. when she was 11 or 12 years old. The first time, Sanchez told H.S. to open her mouth and then kissed her. Over the next year and a half, Sanchez would kiss H.S.'s breasts and ask her to kiss him in return for things she needed. One night while H.S. was sleeping, Sanchez put his hand down her pajama pants and started touching her vagina. H.S. pretended to be asleep.

H.S. felt ashamed, afraid, and confused. She tried to disclose the abuse to her grandmother and mother, telling them that Sanchez made her "open [her] mouth." H.S.'s grandmother

_____

[1]     Statutory references are to the Penal Code.

2

did nothing to help, and H.S.'s mother seemed skeptical. Based on these reactions, H.S. thought it was futile to tell them anything else about the abuse. She also felt ashamed and worried she might be forced to leave her siblings.

When H.S. was 14 years old, Sanchez and H.S. moved to California to find work. The rest of their family stayed in Guatemala. Sanchez and H.S. lived together in a small house. At first, Sanchez slept in a bed and H.S. slept on an inflatable mattress on the ground. At some point, Sanchez told H.S. she had to sleep in the bed with him.

H.S. was 14 years old the first time Sanchez vaginally penetrated her. H.S. and Sanchez were in bed together, and Sanchez was naked. Sanchez lowered H.S.'s underwear and penetrated her vagina with his penis. H.S. screamed and started crying. Afterwards, Sanchez said he needed to go to work and could not stay around to make sure H.S. went back to sleep.

H.S. estimated that Sanchez vaginally penetrated her 90 more times. He would sometimes kiss her vagina and ask her to kiss his penis, which she did. H.S. was shocked, terrorized, and fearful during the abuse. She felt like she was in hell with no way out, and she contemplated suicide.

H.S. denied that Sanchez physically forced her to have sex. However, she suggested he used mental force instead. According to H.S., Sanchez warned her not to tell anyone about the abuse or else he would have problems with the police and H.S. would never see her family again. She was scared to be separated from Sanchez because she was underage and "didn't have anybody." She said Sanchez's warnings were a component of the mental force he used against her.

When H.S. was 16 years old, Sanchez found a job for her at a bakery. Manuel Cruz—who was 41 or 42 years old—was one of her coworkers. H.S. eventually told Cruz about Sanchez's abuse, thinking he might be able to help her.

Once it was clear that Cruz would not help, H.S. came up with a new plan to try to stop the abuse. As part of that plan, H.S. had sex with Cruz three times. She then told Sanchez about her relationship with Cruz, expecting he would be upset and want to report it to the police.

As H.S. predicted, Sanchez was angry and decided to report Cruz to the police. He told H.S. to lie to the police and tell them Cruz threatened her and abused her sexually. Sanchez cautioned H.S. not to tell the police about his sexual abuse.

The police interviewed H.S. as part of their investigation of Cruz. During the interview, H.S. told the officers about Sanchez's abuse. She was embarrassed and ashamed, so she claimed she and Sanchez had sex only twice.

Sergeant Leslie Brenner interviewed Sanchez about the abuse, and the prosecutor played for the jury a video of that interview. Sanchez initially denied ever touching H.S. inappropriately. After Brenner suggested H.S. had videotaped him, Sanchez admitted having vaginal sex with her. Sanchez agreed "it was just one time, if you were drunk, if it was dark and you drank a lot." Later, he admitted having vaginal sex with H.S. three or four times. Sanchez admitted kissing H.S.'s vagina once, but he said he never forced her to kiss his penis. Sanchez said, "[I]t happened, maybe because I felt lonely," and "we ran with our desires, so when it happened, it happened."

In addition to the evidence summarized above, the prosecutor presented expert testimony on Child Sexual Abuse

Accommodation Syndrome (CSAAS).  We discuss the testimony in more detail later in the opinion.

## 2.     *The defense case*

Sanchez testified in his own defense.  He denied having ever sexually abused H.S.  Sanchez suggested H.S. fabricated the allegations against him because she was upset that he would not allow her to go to school.  According to Sanchez, H.S. was not happy to have to work and she accused Sanchez of exploiting her.  Sanchez believed Cruz had promised H.S. he would let her study once she turned 18 years old.

Sanchez testified his admissions to the police were false.  Sanchez said he was nervous during the interview and thought Brenner wanted him to admit having sexual contact with H.S.  At the time, he believed Brenner would report him to immigration authorities if he did not admit the abuse.  Sanchez never had the opportunity to correct the false statements he made at the interview.

## 3.     *The verdicts and sentence*

The jury found Sanchez guilty of four counts of forcible rape of a minor 14 years of age or older and one count of forcible oral copulation of a minor 14 years of age or older.  The jury found Sanchez not guilty of the other three counts of forcible oral copulation.

Sanchez waived his right to a jury on the issue of aggravating circumstances.  After a bench trial, the court found H.S. was not a particularly vulnerable victim and there were no other aggravating circumstances.

The court sentenced Sanchez to an aggregate term of 22 years, consisting of the midterm of nine years on one of the rape counts, the low term of seven years on a different

5

rape count, and the low term of six years on the oral copulation count. The court imposed low terms on the remaining rape counts, which it then stayed.

Sanchez timely appealed.

## DISCUSSION

1. ***There were no errors related to the admission of CSAAS evidence***

Sanchez argues the trial court erred in admitting expert testimony concerning CSAAS. He contends the trial court should have excluded the testimony under either Evidence Code section 801 or Evidence Code section 352.[2] Separately, Sanchez contends defense counsel provided ineffective assistance by failing to object to the expert's testimony and the prosecutor's argument to the extent they were outside the scope of a pretrial ruling.

    a.    *Background*

Before trial, Sanchez filed a motion to limit or exclude CSAAS evidence. He argued CSAAS does not meet the requirements for admissibility because it is not scientific, reliable, or supported by current research. Additionally, Sanchez argued CSAAS evidence should be excluded under

---

[2]    We reject the Attorney General's contention that Sanchez forfeited these arguments by failing to renew his objections at trial after the court denied his motion in limine to exclude CSAAS evidence. (See *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.) The court's ruling on the motion in limine was "sufficiently definite and express" as to preserve the claim for appeal. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) Moreover, any objection at trial would have been futile. (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

6

Evidence Code section 352 because it is confusing, time consuming, and more prejudicial than probative.

The court denied the motion, noting CSAAS evidence has been permitted in California for many years. However, the court ruled the prosecution could not present the evidence in such a way as to suggest it shows the victim was abused. Instead, the prosecution must make clear to the jury the purpose of CSAAS evidence is simply to show the victim's behavior is not inconsistent with having been abused.

At trial, the prosecutor presented expert testimony on CSAAS from Dr. Laura Maltby, who is a clinical psychologist. Dr. Maltby testified that she provides therapy and counseling to children who are victims of abuse, and she has treated more than 200 children who have suffered sexual abuse. Dr. Maltby also works as a child forensic interviewer and has interviewed more than 600 victims of child abuse. Dr. Maltby did not interview any witnesses in the case or review any reports associated with it.

Dr. Maltby explained that Dr. Roland Summit developed CSAAS to describe confusing or counterintuitive behaviors he observed in child victims of sexual abuse. Dr. Maltby stressed that CSAAS cannot be used to determine whether a child was sexually abused. Instead, it is used only to understand and explain a victim's behavior.

Dr. Maltby discussed the five components of CSAAS: (1) secrecy—child sexual abuse happens in private, which sends an implicit message that the child should not talk about it; (2) helplessness—children are taught to be submissive and do what adults tell them to do; (3) accommodation—children find a way to live with the abuse, sometimes by pretending it

is not happening; (4) recantation—some victims make disclosures and then take them back; and (5) delayed disclosure—most disclosures happen after a delay and are piecemeal. Not every abused child will display all five components of CSAAS. Nor does the fact that all five components are present mean a child was sexually abused.

Dr. Maltby focused on the delayed disclosure component of CSAAS. She explained there are three broad reasons children delay disclosure. First, a child may have an otherwise positive relationship with the abuser and does not want that person out of his or her life. Second, the abuser may threaten the child. And third, a child may fear being disbelieved.

The court instructed the jury that Dr. Maltby's testimony "is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [H.S.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

b. *CSAAS evidence is not inadmissible as a matter of law*

For more than three decades, California courts have consistently held CSAAS evidence is admissible in criminal trials for the limited purpose of disabusing the jury of common misconceptions about child victims of sexual abuse. (See, e.g., *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*); *People v. Ramirez* (2023) 98 Cal.App.5th 175, 214, review den. Feb. 28, 2024; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171; *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Housley* (1992) 6 Cal.App.4th

8

947, 955–956; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 (*Bowker*).)

Despite this authority, Sanchez contends CSAAS evidence is inadmissible as a matter of law because it is a largely discredited theory with no proven scientific value, confuses the jury, and improperly vouches for the prosecution's witness. In support of those assertions, Sanchez cites cases from other states that have held CSAAS evidence is inadmissible as a matter of law.  (See *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557, 561; *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 526–530; *State v. J.L.G.* (2018) 234 N.J. 265, 271–272; *Hadden v. State* (Fla. 1997) 690 So.2d 573, 578–579; *State v. Foret* (La. 1993) 628 So.2d 1116, 1126–1127; *State v. Tjernagel* (Iowa Ct.App. 2017) 895 N.W.2d 922.)

While caselaw from other jurisdictions may be instructive, it is not binding.  In contrast, we are bound by California Supreme Court precedent.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)  That includes *McAlpin*, *supra*, 53 Cal.3d 1289, a case in which our state's high court approved the use of CSAAS evidence.

In *McAlpin*, a prosecution expert testified it is not unusual for a parent to refrain from reporting a known molestation of his or her child.  (*McAlpin, supra*, 53 Cal.3d at p. 1300.)  To determine whether the testimony was admissible, the California Supreme Court drew a "direct analogy" to CSAAS evidence. (*Ibid*.)  The high court explained that appellate courts had created the rule that CSAAS evidence is admissible " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*Id*. at pp. 1300–1301.)

The court stated the CSAAS rule is "equally applicable" to evidence regarding the behavior of parents of abused children. (*Id*. at p. 1301.) Accordingly, the court held the expert's testimony was admissible for the purpose of disabusing jurors of misconceptions about parents of abused children. (*Id*. at pp. 1301–1302.)

Although the court in *McAlpin* did not expressly hold CSAAS evidence is admissible, its reasoning compels that conclusion. As the Supreme Court noted, its reasons for allowing the admission of expert testimony concerning the behavior of parents of sexually abused children are "equally applicable" to expert testimony concerning the behavior of sexually abused children. (*McAlpin, supra*, 53 Cal.3d at p. 1301.) Until the California Supreme Court revisits the issue, we are bound to follow *McAlpin* and must reject Sanchez's argument that CSAAS evidence is inadmissible as a matter of law. (See *Auto Equity, supra*, 57 Cal.3d at p. 455.) The fact that a handful of courts in other jurisdictions have reached a different conclusion is irrelevant. (See *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*) [that other jurisdictions may disagree with *McAlpin* does not affect its binding nature].)

     c.     *CSAAS evidence is not inadmissible under Evidence Code section 801*

Sanchez suggests we need not follow *McAlpin* because, in the time since that case was decided, it has become evident that CSAAS is a discredited theory. Therefore, he argues, CSAAS evidence no longer meets the requirements of Evidence Code section 801.

Under Evidence Code section 801, the trial court acts as a gatekeeper to exclude expert opinion testimony that is not

10

"[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates."  (Evid. Code, § 801, subd. (b); see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772.)  In its gatekeeper function, the "court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion.  Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. . . .  The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion."  (*Sargon*, at p. 772.)  "Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion."  (*Id*. at p. 773.)

Sanchez contends CSAAS evidence fails to satisfy Evidence Code section 801 because " 'the scientific community is not in general agreement that CSAAS is based on reliable scientific research.' "  Sanchez made the same argument in the trial court. In support, he cited two research articles concluding that, while there is empirical evidence that children commonly delay disclosure of sexual abuse, there is a lack of evidence "to suggest that denials, recantations, and re-disclosures are typical when abused children are directly asked about abuse."  (London et al., *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell?* (2005) Vol. 11, No. 1, Psychol. Pub. Pol'y & L. 194, 197; see London et al., *Review of the Contemporary Literature on How Children Report Sexual Abuse to Others: Findings, Methodological Issues, and Implications for Forensic Interviewers* (2008) Vol. 16, No. 1, Memory 29.)

The court in *Munch, supra*, 52 Cal.App.5th 464, rejected a similar challenge to CSAAS evidence based on one of the articles Sanchez cited. As that court explained, the " 'conclusion regarding recantation rates has itself been challenged by other professionals who have likewise reviewed the empirical data.' " (*Id.* at p. 470.) The court went on to cite several research articles finding child victims of sexual abuse commonly recant. (*Id.* at pp. 470–471.) Like the *Munch* court, we decline to hold the existence of a small number of articles critical of certain aspects of CSAAS—which themselves have been criticized—invalidates *McAlpin* and renders CSAAS evidence inadmissible as a matter of law.

Sanchez also contends CSAAS evidence is inadmissible under Evidence Code section 801 because it cannot be "statistically tested." Sanchez does not explain what he means by "statistically tested," nor is it self-evident that CSAAS evidence fails to meet that standard. Sanchez points to Dr. Maltby's testimony that, because there is no "common causal" connection for CSAAS symptoms, "we can't test it numerically as a syndrome per [se]." We do not understand Dr. Maltby to mean CSAAS cannot be tested statistically. Indeed, Dr. Maltby went on to explain that some elements of CSAAS—specifically, delayed and piecemeal disclosure—have been studied and are supported by the research. In any event, even if CSAAS could not be statistically tested, Sanchez fails to cite any authority holding an expert may rely on a theory only if it meets that standard.

We also reject Sanchez's passing contention that Dr. Maltby's testimony was inadmissible because she had not personally conducted research on CSAAS. Although Sanchez seems to argue this rendered the testimony inadmissible under

12

Evidence Code section 801, it is essentially a challenge to Dr. Maltby's qualifications as an expert, which is governed by Evidence Code section 720.  Under that statute, a "person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."  (Evid. Code, § 720, subd. (a).)  Sanchez did not object to Dr. Maltby's testimony on this ground in the trial court, which forfeits the issue on appeal.  (*People v. Bolin (*1998) 18 Cal.4th 297, 321.)  In any event, Dr. Maltby's education, training, extensive experience working with child victims of sexual abuse, and familiarity with CSAAS were more than sufficient to qualify her as an expert under Evidence Code section 720.

> d. *Dr. Maltby's testimony was not inadmissible under Evidence Code section 352*

Sanchez argues the trial court should have excluded Dr. Maltby's testimony under Evidence Code section 352.  According to Sanchez, the testimony lacked probative value because it was not directed at a specific myth or misconception suggested by the evidence.  On the other hand, the testimony was confusing and improperly bolstered the prosecution's case.

Evidence is not inadmissible under Evidence Code section 352 unless the probative value is substantially outweighed by the probability of a substantial danger of confusing the issues or misleading the jury.  (*People v. Fruits* (2016) 247 Cal.App.4th 188, 201, 205.)  We review a trial court's decision to admit evidence over an Evidence Code section 352 objection for abuse of discretion.  (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1397.)

13

The record belies Sanchez's contention that Dr. Maltby's testimony was not targeted at a specific myth or misconception suggested by the evidence. H.S.'s behavior exemplified delayed disclosure, a core component of CSAAS. H.S. testified that Sanchez first sexually abused her when she was 11 or 12 years old. She tried to disclose the abuse to her mother and grandmother by cryptically referring to the fact that Sanchz made her "open [her] mouth." Although the abuse continued and escalated in severity, H.S. waited four or five years—until she was 16 years old—to disclose it again, first to Cruz and then to the police. Even then, H.S. continued to downplay the severity of the abuse, telling the police it happened only twice.

Defense counsel used H.S.'s delayed and piecemeal disclosures to attack her credibility. During closing argument, counsel pointed to evidence showing H.S. had opportunities to report the abuse much earlier, yet she failed to take advantage of them. Counsel also drew attention to the fact that H.S.'s accounts of the abuse changed over time.

It is well established that CSAAS evidence may be admitted to rehabilitate a "witness's credibility when the defendant suggests that the child's conduct after the incident —e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin, supra,* 53 Cal.3d at p. 1300.) Dr. Maltby's testimony on delayed and piecemeal disclosure did precisely that. Her testimony, therefore, was both relevant and highly probative.

We also reject Sanchez's argument that Dr. Maltby's testimony may have confused the jury. According to Sanchez, it was confusing to introduce a scientific theory that posits a witness's inconsistent statements may be explained away by

14

the very substance of the accusation.  It is not apparent—and Sanchez does not explain—why this would have been confusing for the jury.  Dr. Maltby explicitly stated CSAAS cannot be used to determine whether a child was abused.  Instead, it merely helps to explain certain behaviors that might otherwise not make sense to adults.

To the extent there was still a risk of confusion, the court instructed the jury that Dr. Maltby's testimony "is not evidence that the defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [H.S.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."  The jurors were capable of understanding and applying these instructions, and we may presume they did so.  (See *People v. Cain* (1995) 10 Cal.4th 1, 34 (*Cain*).)  On this record, there is no reason to suspect Dr. Maltby's testimony might confuse the jury.

Nor is there merit to Sanchez's contention that the prosecutor used CSAAS evidence to prove the abuse occurred by tailoring Dr. Maltby's testimony to the facts of the case. There is nothing inherently improper about CSAAS testimony mirroring the facts of a specific case.  Indeed, if there were no similarities, the CSAAS evidence would be irrelevant and inadmissible.  (See *Bowker, supra*, 203 Cal.App.3d at pp. 393–394 [CSAAS evidence must be "targeted to a specific 'myth' or 'misconception' suggested by the evidence"].)

Moreover, although portions of Dr. Maltby's testimony mirrored H.S.'s account of the abuse, the vast majority of it did not.  As defense counsel pointed out in her closing argument, much of H.S.'s behavior did not fit the CSAAS model.  Even

on the issue of delayed disclosure—which was the most relevant CSAAS factor—Dr. Maltby suggested several explanations for the behavior, only some of which were consistent with the facts of this case. Considering Dr. Maltby's testimony as a whole, the similarities to the case were not so pervasive as to invite the jurors to infer Sanchez's guilt. (See *People v. Sedano* (2023) 88 Cal.App.5th 474, 477–478, 482–483 [expert's testimony that non-strangers—including uncles—make up the vast majority of child abusers did not invite jury to infer the accuser's uncle was guilty, where the expert provided a " 'laundry list' " of the types of people who can be abusers].)

Sanchez contends the prosecutor nevertheless acted improperly by arguing it was " 'no coincidence' " that the facts of this case parallel Dr. Maltby's testimony concerning common behaviors of victims of abuse. The prosecutor made no such argument, and Sanchez's insistence otherwise is based on an unreasonable interpretation of the record. During her closing argument, the prosecutor said it was "no coincidence" that H.S. made a piecemeal disclosure to the police. However, the prosecutor was not drawing a parallel to Dr. Maltby's testimony. Rather, she was pointing out that H.S. had made prior unsuccessful disclosures. According to the prosecutor, it was "no coincidence" that H.S. was hesitant to make a full disclosure to the police given her prior disclosures were unsuccessful. There is nothing improper about her argument.

Nor did the prosecutor improperly use Dr. Maltby's testimony to vouch for H.S.'s credibility. "As a general matter, '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that

16

information not presented to the jury supports the witness's testimony.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329.) The prosecutor did nothing of the sort, either while questioning Dr. Maltby or during her closing argument.

We also reject Sanchez's other passing contentions concerning the prosecutor's closing argument. The prosecutor did not act improperly by reminding the jury that Dr. Maltby had an extensive resume and had not spoken to H.S. The prosecutor's remarks were directly responsive to the court's instruction to consider Dr. Maltby's "knowledge, skill, experience, training, and education . . . and the facts and information on which" she relied when determining what weight to give her testimony. (See CALCRIM No. 332.) Nor is there anything improper about the prosecutor highlighting Dr. Maltby's testimony that it is a "common reaction" for children not to fight back while being abused. The prosecutor accurately summarized Dr. Maltby's testimony, and the comment was helpful to disabuse jurors of potential misconceptions concerning the behavior of child victims of sexual abuse.

Sanchez's reliance on *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*)*,* is misplaced. In that case, the jury convicted the defendant of several counts of annoying or molesting a minor and contacting a minor with the intent to commit a sexual offense. (*Id*. at pp. 37–38.) None of the victims accused the defendant of touching them inappropriately. (*Id*. at pp. 38–39, 43.) Nevertheless, the prosecutor's first witness at trial was an expert on CSAAS. (*Id*. at p. 46.) During her closing argument, the prosecutor asserted she presented the CSAAS evidence to show " '*how victims do and do not react to these kind of situations, how they do and do not present as*

17

*victims in this case, and he told you that victims don't always show signs of abuse.' "* (*Id.* at p. 63, original italics.)

On appeal, the court held defense counsel provided ineffective assistance by failing to object to both the introduction of CSAAS evidence and the prosecutor's argument concerning it. (*Clotfelter, supra*, 65 Cal.App.5th at p. 65.) The court explained it was "not at all apparent that CSAAS testimony was relevant," particularly given the alleged victims never accused the defendant of touching them inappropriately. (*Id.* at p. 64.) The court also noted the prosecutor's argument was improper to the extent it invited the jurors to use CSAAS evidence to infer sexual abuse occurred. (*Ibid.*)

The unique circumstances of *Clotfelter* bear no resemblance to this case. Here, H.S. directly accused Sanchez of sexual abuse, and Sanchez challenged her credibility based on her delayed and piecemeal disclosures. Therefore, unlike *Clotfelter*, CSAAS evidence was directly relevant and probative. Also unlike *Clotfelter*, the prosecutor took care not to invite the jury to use Dr. Maltby's testimony for an improper purpose. The prosecutor instead elicited testimony from Dr. Maltby explaining that CSAAS cannot be used to diagnose sexual abuse or otherwise prove that it occurred. The prosecutor then highlighted this testimony during her closing argument. The court similarly instructed the jury that Dr. Maltby's testimony "is not evidence that the defendant committed any of the crimes charged against him." We may presume the jurors followed the court's instructions, which were sufficient to ensure they did not use Dr. Maltby's testimony to infer sexual abuse occurred. (See *Cain, supra*, 10 Cal.4th at p. 34.)

18

e.    *Defense counsel did not provide ineffective assistance*

Sanchez argues defense counsel provided constitutionally deficient assistance.  According to Sanchez, before trial, the court ruled that Dr. Maltby could testify only to the issue of delayed disclosure.  Despite this ruling, Dr. Maltby testified without objection to all five components of CSAAS, which the prosecutor subsequently discussed during her closing argument.  Sanchez asserts, based on the court's pretrial ruling, there is no reasonable strategy for defense counsel not to "ensure the prosecutor stuck within the requested and granted limitations" on CSAAS evidence by objecting to the testimony and argument.

Under either the federal or state Constitution, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686.)  To establish a claim for ineffective assistance of counsel, a defendant must show by a preponderance of the evidence that his counsel's representation was objectively unreasonable, and that it is reasonably probable that the outcome of his trial would have been different but for counsel's error.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

19

Here, Sanchez's ineffective assistance of counsel claim rests on a faulty premise. Contrary to his contentions, the trial court did not rule the prosecutor could present expert testimony only on the issue of delayed disclosure. Sanchez relies on comments the court made while it was discussing the limited purposes for which the People could present CSAAS evidence. During that discussion, the court explained the prosecutor could not present expert testimony on delayed disclosure in such a way as to suggest the delayed disclosure is itself evidence a child was abused. Instead, it must be clear the expert testimony is relevant only to show the delayed disclosure is not inconsistent with the child having been abused.

Sanchez seems to interpret the court's comments as restricting the subject matters to which Dr. Maltby could testify. However, read in context, it is apparent that was not the court's intention. Instead, the court clearly intended to restrict the purposes for which the testimony could be used, and to ensure the prosecutor presented the evidence in a way consistent with those purposes. The court simply used the issue of delayed disclosure as an example to illustrate its point. Because the court did not limit Dr. Maltby's testimony to the issue of delayed disclosure, defense counsel acted reasonably by declining to object when the testimony went beyond that issue. Indeed, no reasonable attorney would object to testimony based on a nonexistent ruling.

## 2. *The trial court was not required to instruct the jury on battery*

Sanchez argues the trial court prejudicially erred by failing to instruct the jury on battery as a lesser included offense of forcible rape and forcible oral sex.

20

Even in the absence of a request, a trial court must instruct the jury on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses. (*People v. Rogers* (2006) 39 Cal.4th 826, 866 (*Rogers*).) A court must instruct on a lesser included offense if there is substantial evidence from which a jury could conclude the defendant is guilty of the lesser offense but not the greater offense. (*People v. Hughes* (2002) 27 Cal.4th 287, 367 (*Hughes*).) Stated another way, a "trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense." (*People v. Simon* (2016) 1 Cal.5th 98, 132.)

An uncharged lesser offense is necessarily included within a charged offense "if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117; see also *People v. Sloan* (2007) 42 Cal.4th 110, 117.)

"A battery is any willful and unlawful use of force or violence upon the person of another." (§ 242.) Forcible rape is an act of sexual intercourse "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) Forcible oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."

21

(§ 287, subds. (a), (c)(2)(C).) The punishments for forcible rape and forcible oral copulation are increased if the victim is a minor. (See §§ 264, subd. (c), 287, subd. (c)(2)(C).)

Sanchez argues the court was required to give a battery instruction because the prosecution presented weak evidence to prove a necessary element of forcible rape and forcible oral copulation. Specifically, he argues the jury may have found he vaginally penetrated and orally copulated H.S. without her consent—which would constitute willful and unlawful uses of force—but he did not accomplish those acts using duress or fear. According to Sanchez, the jury instead may have found H.S. went along with the sexual abuse merely because she was "mentally conditioned to comply" with it. If so, the jury would have convicted him of battery, but not forcible rape or forcible oral copulation.

Even assuming battery is a lesser included offense of the charged crimes (see *Hughes*, *supra*, 27 Cal.4th at pp. 365–366)*,* the trial court was not required to instruct the jury on it. Contrary to Sanchez's suggestions, a court is not required to instruct on a lesser included offense merely because the jury might not find all the elements of the greater offense to be proven beyond a reasonable doubt. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1063 (*Kraft*); *People v. Acevedo* (1985) 166 Cal.App.3d 196, 201 (*Acevedo*).) If that were sufficient, a court would be required to instruct the jury on every lesser included offense of every crime charged. Instead, a court is required to instruct on a lesser included offense only if there is some "proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged." (*Kraft*, at p. 1063.)

22

*Hughes, supra*, 27 Cal.4th 287, is instructive. In that case, the defendant argued the trial court erred by failing to instruct the jury on battery as a lesser included offense of forcible sodomy. (*Id.* at p. 366.) The defendant asserted the battery instruction was warranted because there was no physical evidence of penile penetration, which is an element of forcible sodomy. The defendant also pointed to a pathologist's testimony that the bruises found inside the victim's rectum were consistent with penetration by a penis, a finger, or another blunt foreign object. (*Id.* at pp. 364, 366–367.) The Supreme Court held the trial court was not required to give a battery instruction under those circumstances, because nothing the defendant pointed to "amounts to substantial evidence that defendant was guilty of battery but *not* forcible sodomy." (*Id.* at p. 367.)

*People v. Lema* (1987) 188 Cal.App.3d 1541 (*Lema*) also is instructive. In *Lema*, the court held a trial court was not required to instruct on assault and battery as lesser included offenses of rape. (*Id.* at pp. 1544–1545.) The court explained that the defendant had tried to convince the jury the sexual activity with the victim was consensual. The court reasoned, "If believed, defendant's version of the events would operate as a complete defense to the charged offenses . . . . Under this theory, the court has no obligation to instruct on the offense of assault and battery since no evidence was presented by the defense that the offenses were less than those charged." (*Id.* at p. 1545.)

The same is true here. Sanchez's defense at trial was that H.S. wholly fabricated the allegations against him. As in *Lema*, Sanchez's version of events amounted to a complete defense to the charged offenses. Had the jury accepted his theory, it would have found him not guilty of any crime, including battery.

23

Although Sanchez now contends the jury may have found H.S. was "mentally conditioned to comply" with the sex acts, he did not raise that theory at trial or present any evidence to support it. Nor does he suggest any grounds for the jury to reach that conclusion, apart from "an unexplainable rejection of the prosecution's evidence." (*Kraft, supra*, 23 Cal.4th at p. 1063.) Under these circumstances, the court was not required to instruct the jury on battery as a lesser included offense of forcible rape and forcible oral copulation. (See *Hughes, supra*, 27 Cal.4th at p. 367; *Lema, supra*, 188 Cal.App.3d at p. 1545; *Acevedo, supra*, 166 Cal.App.3d at pp. 200–201 [the mere possibility the jury would disbelieve the victim's testimony that the defendant used force did not warrant instructions on lesser included offenses of rape].)

For the first time in his reply brief, Sanchez argues his statements to the police provided the substantial evidence necessary to convict him of battery, but not forcible rape or forcible oral copulation. Sanchez forfeited this argument by failing to raise it in his opening brief. (See *People v. Taylor* (2020) 43 Cal.App.5th 1102, 1114 [arguments raised for first time in reply brief are tardy and forfeited].) He also fails to identify the specific statements that would have allowed the jury to convict him of battery, but not the forcible sex crimes. The only statement that could conceivably support such a verdict is Sanchez's brief remark that "we ran with our desires." Viewed in the light most favorable to Sanchez, the statement might suggest H.S. was a willing participant in the sex acts. However, Sanchez did not elaborate on the point during the interview, nor is there any other evidence in the record to support it. Accordingly, it does not provide the substantial evidence

24

necessary to warrant a battery instruction. (See *People v. Baker* (2012) 204 Cal.App.4th 1234, 1247 ["substantial evidence does not mean any evidence, no matter how slight"].)

Even if the court should have instructed the jury on battery, the error was harmless. A trial court's failure to instruct on a lesser included offense is harmless if the defendant "cannot demonstrate a reasonable probability that the jury would have—without the error—reached a different result." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 191.) We review a trial court's failure to instruct on a lesser included offense for prejudice under the *People v. Watson* (1956) 46 Cal.2d 818 harmless error standard. (*Rogers, supra*, 39 Cal.4th at pp. 867–868; see *People v. Schuller* (2023) 15 Cal.5th 237, 260.) Such an error "does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.' " (*People v. Wyatt* (2012) 55 Cal.4th 694, 698; *People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Sanchez contends it is reasonably likely some jurors would have convicted him of battery had the court instructed them on that offense. According to Sanchez, because the prosecutor presented weak evidence that he accomplished the sex acts using duress or fear of bodily harm, some jurors may not have been sufficiently convinced that he committed forcible rape and forcible oral copulation. However, those jurors nevertheless may have convicted him simply because they were presented with an all-or-nothing choice.

While we agree the evidence of fear was far from overwhelming, the same cannot be said for the evidence of duress. On that issue, the trial court instructed the jury that duress "means a direct or implied threat of force, violence, danger

25

or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the person's age and her relationship to the defendant."

The evidence that Sanchez accomplished the sex acts using duress was overwhelming.  H.S. testified that Sanchez is her biological father and would physically hit her when she misbehaved.  According to H.S., Sanchez started sexually abusing her when she was relatively young—11 or 12 years old—and continued abusing her for several years.  When H.S. was 14 years old, Sanchez brought her to the United States, which is where he committed the charged sex acts.  H.S. testified that she screamed the first time Sanchez penetrated her, and she felt shocked, terrorized, and fearful during the sex acts.

H.S. acknowledged that Sanchez did not physically force her to have sex.  However, she suggested he used mental force instead, which she considered to be stronger than physical force.  H.S. explained that, as a component of this mental force, Sanchez warned her not to tell anyone about the abuse or else he would have problems with the police, she would be separated from her family, and she would never see her family again.  H.S. said she was scared to be separated from Sanchez because she was underage and "didn't have anybody."

Where, as here, "the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072–1073.)  Considering the other circumstances—including that Sanchez abused H.S. while she was under his sole care, isolated from the rest of her family, and living in a foreign

26

country—there is no reasonable possibility a juror could have concluded this is one of those rare cases.  Accordingly, even if the court had instructed the jury on battery, we are sufficiently confident the result would have been the same.

## DISPOSITION

We affirm the judgment.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.